IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TLS GROUP, S.A.,<br><br>　　　Plaintiff,<br><br>　　　vs.<br><br>NUCLOUD GLOBAL, INC.,<br><br>　　　Defendant. | **MEMORANDUM DECISION<br>AND ORDER** |
| NUCLOUD GLOBAL, INC.,<br><br>　　　Counterclaim-Plaintiff,<br><br>　　　vs.<br><br>TLS GROUP, S.A.;<br>TELEPERFORMANCE, S.A.;<br>TPUSA, INC.; and<br>TELEPERFORMANCE GROUP, INC.,<br><br>　　　Counterclaim-Defendants. | Case No. 2:15-cv-00533-TC |

This case centers on a dispute between two technology companies over the ownership of proprietary software.  Each party has filed a motion with the court: Plaintiff and Counterclaim-Defendant TLS Group, S.A., (TLS) has moved to dismiss counterclaims brought against it, as well as TLS's parent corporation, Teleperformance, S.A., and TLS's sister corporations, TPUSA, Inc., and Teleperformance Group, Inc. (the parent and sister corporations will be collectively referred to as the "TP Entities").  Defendant and Counterclaimant NuCloud Global,

Inc. (NuCloud),[1] asks for leave to amend its counterclaim for a third time.[2]  TLS and the TP Entities object to the proposed amendment contending that the amendments would be futile.

For the reasons discussed below, the court grants in part and denies in part TLS's and the TP Entities' Motion to Dismiss (ECF No. 29), and grants in part and denies in part NuCloud's Motion for Leave to File a Proposed Third Amended Counterclaim (ECF No. 36).

## BACKGROUND

The facts are taken from the allegations in NuCloud's proposed Third Amended Counterclaim, which are accepted as true for purposes of these motions only.

TLS provides information-technology services to organizations; one of its largest clients is the United Kingdom's Visa and Immigration (UKVI) service.  NuCloud is a company focused on cloud computing, software, and technology.  In the spring of 2013, TLS and NuCloud signed a Consulting Agreement, under which NuCloud wrote software that enabled TLS to provide cloud-computing technology to its clients, including the UKVI client.

But by the fall of 2014, the relationship had deteriorated because TLS supposedly interfered with NuCloud's work, destroyed morale, refused to pay on time, and rejected attempts to enter into a new agreement with NuCloud.  In October 2014, NuCloud told TLS that because

---

[1] After the complaint was filed, Defendant NuCloud Global supposedly changed its name to NCG Services, Inc., but it has not yet filed a correction with the court's clerk.  Similarly, Teleperformance, S.A., supposedly became Teleperformance, S.E.  Until a party notifies the clerk of the changes, the court will continue to refer to the party the way the docket lists it.

[2] In its complaint, TLS does not allege the location of its principal place of business.  And NuCloud's proposed Third Amended Counterclaim does not state where the TP Entities' principal places of business are.  Section 1332(c) of Title 28 of the U.S. Code requires TLS and NuCloud to further amend their pleadings to establish the parties' full citizenship.

TLS had breached the Agreement, NuCloud was stopping its work, and, significantly, that TLS could no longer use NuCloud's software on the UKVI project.

In an attempt to save the relationship, two of the TP Entities' executives, Brent Welch and Dev Mudaliar, negotiated two new agreements between TLS and NuCloud. According to Mr. Welch and Mr. Mudaliar, the agreements would resolve all disputes and set a new course for the future. Mr. Welch and Mr. Mudaliar assured NuCloud that the TP Entities controlled TLS and the TP Entities would compel TLS to perform its contractual obligations. Furthermore, Mr. Welch and Mr. Mudaliar represented that the TP Entities would consider hiring NuCloud for their own work separate from the TLS relationship.

The two new agreements between TLS and NuCloud were the Settlement Agreement and Mutual Release (SAMR) and the Services Agreement. The parties signed the agreements on December 18, 2014. But within a week of the signing, the relationship soured with each party contending that the other was breaching the agreements.

In the summer of 2015, TLS sued NuCloud in this court. NuCloud filed a counterclaim listing fourteen causes of action against TLS and three causes of action against the TP Entities. TLS filed a criminal complaint against NuCloud in Luxembourg, where TLS is incorporated.

TLS and the TP Entities now move to dismiss seven of NuCloud's counterclaims: abuse of process, fraudulent inducement, fraudulent misrepresentation, unjust enrichment, trade defamation, tortious interference with business relationships, and violation of § 1201(a)(1) of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201–1205 (2012). NuCloud asks the court for leave to amend its counterclaim; it proposes to supplement its allegations and add a negligent-misrepresentation claim against the TP Entities.

<u>**DISCUSSION**</u>

I.      **The claims**

NuCloud raised fifteen claims in its Second Amended Counterclaim against TLS and the

TP Entities collectively.  TLS & the TP Entities now move to dismiss eight of those claims[3]

under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In light of their motion, NuCloud

seeks the court leave to amend and submits a proposed Third Amended Counterclaim.  The

proposed counterclaim would (1) withdraw the abuse-of-process and fraudulent-

misrepresentation claims; (2) leave the unjust-enrichment claim without amendment from the

Second Amended Counterclaim; (3) amend and supplement the trade-defamation claim, the

intentional-interference-with-business-relationships claim, the violation of the DMCA claim, the

two fraudulent-inducement claims along with addition factual allegations; and finally (4) add a

completely new negligent-misrepresentation claim.

The court accepts NuCloud's withdrawal, or stipulated dismissal, of the abuse-of-process

and fraudulent-misrepresention claims.  The court analyzes the remaining three types of claims

in order.

A.      **The unjust-enrichment claim, which NuCloud does not seek to amend**

When assessing whether to dismiss a claim, the court "must accept all the well-pleaded

allegations of the complaint as true and must construe them in the light most favorable" to the

claimant.  <u>Thomas v. Kaven</u>, 765 F.3d 1183, 1190 (10th Cir. 2014).  But the court is not required

to accept legal conclusions as true; a pleading "must offer specific factual allegations to support

---

[3] Those claims include: trade defamation, intentional interference with business
relationships, violation of the Digital Millennium Copyright Act, unjust enrichment, abuse of
process, fraudulent inducement for the SAMR, fraudulent inducement for the Services
Agreement, and fraudulent misrepresentation.

each claim." Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1214 (10th Cir. 2011) (citing

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  For a claim to survive dismissal, a

pleading "must have enough allegations of fact, taken as true, 'to state a claim to relief that is

plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

TLS argues that the unjust-enrichment claim is precluded by the other breach-of-contract

claims found in the both the second and the proposed Third Amended Counterclaim.  TLS is

correct that if NuCloud were to prevail on the contract claims, equitable relief would not be

possible.  Ashby v. Ashby, 227 P.3d 246, 251 (Utah 2010).  But the fact that a contract claim

would preclude recovery under an equity claim does not foreclose a party's ability to plead them

in the alternative.  Id. ("[The unjust enrichment claim] is . . . essentially an alternative basis for

recovery in the event her contract claim fails.").  Pleading inconsistent claims in the alternative

is explicitly allowed.  Fed. R. Civ. P. 8(d)(2), (d)(3); Cleveland v. Policy Mgmt. Sys. Corp., 526

U.S. 795, 805 (1999) ("Our ordinary Rules recognize that a person may not be sure in advance

upon which legal theory she will succeed, and so permit parties to 'set forth two or more

statements of a claim or defense alternately or hypothetically,' and to 'state as many separate

claims or defenses as the party has regardless of consistency.'"), quoted with approval in

Montano v. Christmas by Krebs Corp., 293 F. App'x 625, 630 (10th Cir. 2008).

Here, NuCloud seeks to set aside, or rescind, the SAMR and Services Agreement under a

theory that the agreements were fraudulently formed.  If NuCloud were to succeed in having

those contracts set aside, it would need an equitable cause of action to obtain relief.  If NuCloud

were to prevail on the breach-of-contract claims, it would not need this alternative route to relief.

**B.      The claims that NuCloud seeks to amend by supplementing the allegations**

Under Federal Rule of Civil Procedure 15(a), NuCloud asks the court for leave to amend

and supplement the factual allegations for these claims: (1) trade defamation, (2) intentional

interference with business relationships, (3) violation of DMCA, and (4) fraudulent inducement.

Normally, the court should grant leave to amend "when justice so requires."  Fed. R. Civ.

P. 15(a).  But TLS and the TP Entities object to the proposed amendment arguing that it would

be futile because, under Rule 12(b)(6), the Third Amended Counterclaim still fails.  The court

may properly "deny a motion for leave to amend as futile when the proposed amended complaint

would be subject to dismissal for any reason" including failure to state a claim.  Bauchman for

Bauchman v. W. High Sch., 132 F.3d 542, 562 (10th Cir. 1997).  Accordingly, the court will

decide whether the factual allegations within the proposed Third Amended Counterclaim, taken

as true, "states a claim to relief that is plausible on its face."  Kan. Penn Gaming, 656 F.3d at

1214 (quoting Twombly, 550 U.S. at 570).

If the factual allegations found within the proposed Third Amended Counterclaim satisfy

the Rule 12(b)(6) standard, the court will grant NuCloud's motion seeking leave to amend.  The

proposed factual allegations for the four claims will be discussed in the same order as discussed

above.

**1.      Trade Defamation**

NuCloud alleges that TLS defamed it with statements to the TP Entities, other technology

firms, and to personnel-recruiting companies.  To establish defamation, a claimant must allege

that (1) the opponent published or orally communicated statements concerning the claimant; (2)

those statements were false, defamatory, and not subject to any privilege; (3) the statements were

made with the requisite degree of fault; and (4) the claimant was damaged by statements.  West v. Thomson Newspapers, 872 P.2d 999, 1007–08 (Utah 1994).  When pleading defamation, a claimant must do so with enough facts to allow the opponent to defend itself.  McGeorge v. Cont'l Airlines, Inc., 871 F.2d 952, 955 (10th Cir. 1989) (citing Fed. R. Civ. P. 8(a)).  Although Utah law provides a heightened pleading standard for defamation claims, in federal court a claimant need only allege facts sufficient to establish plausibility in accordance with Rule 8 of the Federal Rules of Civil Procedure.  Biro v. Conde Nast, 807 F.3d 541, 545 (2d Cir. 2015); Pippen v. NBCUniversal Media, LLC, 734 F.3d 610, 614 (7th Cir. 2013); Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 377 (4th Cir. 2012) (quoting Hatfill v. N.Y. Times Co., 416 F.3d 320, 329 (4th Cir. 2005)); Schatz v. Republican State Leadership Comm., 669 F.3d 50, 58 (1st Cir. 2012); see Hogan v. Winder, 762 F.3d 1096, 1104 (10th Cir. 2014) (applying, in the context of a defamation claim, the federal plausibility standard without discussing whether to apply the higher state standard).

### (a)        The statements TLS allegedly made and to whom

NuCloud alleges, in its proposed Third Amended Counterclaim, that TLS made false statements about NuCloud on three separate occasions.  First, NuCloud alleges that during the February and March 2015 steering meetings, Mr. Weisgerber and Mr. Curran stated to Mr. Welch and Mr. Mudaliar and other Teleperformance representatives that NuCloud caused certain server outages; failed to deliver a working "high-availability function" for the servers; and failed to develop a scheduling system and other tasks.  Second, between October and November 2014, Mr. Curran allegedly stated to technology firms with which NuCloud was negotiating commercial agreements (including two companies called Source8 and Execis) that NuCloud

failed to complete work assigned to it, caused multiple server outages, and failed to create working backup systems for those servers.  Third, in March 2015, an unknown person within TLS stated to recruiting firms (including Corus360, Daugherty Systems, Greythorn, and Mitchel Martin) that NuCloud failed to perform work for a major European project; caused multiple software failures for its client; and faced dissolution.

NuCloud also alleges facts and information that support its conclusions that these statements were made and that they were false.  For example, "After the February and March 2015 monthly steering committee meetings . . . , Mr. Mudaliar reported to Mr. Haury that Mr. Curran had accused NuCloud of failing to provide a working high-availability function for the . . . servers, of causing the server outages . . . , and for failing to complete tasking orders." (Proposed 3d Am. Countercl. ¶ 295(A)(xix).)  At the same time, NuCloud alleges that TLS accepted the delivery of the "high-availability function" and acknowledged that it "worked perfectly as part of a pre-agreed acceptance testing process in the late spring of 2014."  (Id. ¶ 295(A)(ix).)  Regarding the statements TLS made to non-Teleperformance firms, NuCloud alleges that "Source8 and Execis . . . reported that they had heard from [Mr.] Curran, in the fall of 2014 that NuCloud had failed to complete work assigned to it[,] . . . that, more recently, they had been told that NuCloud had caused server outages . . . and had failed to create working backup systems for those servers."  (Id. ¶ 295(B)(iii).)  And NuCloud alleges that at least parts of these statements were false because "NuCloud had no responsibility for or control over the maintenance or operation of the [servers] at the time of the outages.  Further, NuCloud later learned that the outages were caused by TLS's attempts to reverse engineer NuCloud access

control mechanisms." (<u>Id.</u> ¶ 295(A)(xi).)  NuCloud sufficiently pleads the substance of these statements and their falsity.

As for the allegedly false statements to the recruiters, NuCloud relies more on inference than it did for the first two groups of statements.  NuCloud alleges that TLS told recruiters statements that were similar those made to the TP Entities based on the conversation recruiters had with NuCloud employees in early 2015.  What the recruiters said to the NuCloud employees was remarkably similar to what TLS had told the TP Entities.  NuCloud's allegations include:

i. At the end of March 2015, representatives of several . . . recruiting agencies, including Corus360, Daugherty Systems, Greythorn, and Mitchell Martin, contacted several NuCloud employees, inquiring whether these employees were interested in resigning their positions with NuCloud.

ii. At that time NuCloud had dozens of employees, only some of whom had worked or were working on the UKVI project.

iii. The only NuCloud employees contacted by these recruiters, however, were . . . individuals who had worked or were working on the UKVI project.

iv. During these calls, these recruiters . . . stated that they had heard from anonymous sources that NuCloud had failed to perform work for a major European project and faced dissolution.

v. Specifically, these recruiters commented that they had heard that NuCloud caused software failures for their client on multiple occasions.

vi. These recruiters' comments closely paralleled the false statements that Mr. Curran made during the February and March 2015 steering committee meetings for TPContact.

vii. It is a common occurrence within the software industry for firms that are competing with one another or have a rocky business relationship to spread false information about another firm to recruiters for the purpose of disrupting business. And to use recruiters to attack the morale of the target company.

viii. Based on the similarities between the statements of the recruiters and the statements of Mr. Curran at the steering committee meetings, together with the timing of the recruiter calls in close proximity to Mr. Curran's statements, the tension between NuCloud and TLS at that time, and the targeting of only

9

> NuCloud employees who had worked on the UKVI project, NuCloud has reason
> to believe that Mr. Curran or someone else at TLS acting with Mr. Curran's
> knowledge or at his direction disseminated false information on these topics to
> these recruiters.

(Proposed 3d Am. Countercl. ¶ 295(C).)  These alleged facts, taken together and in the context

of all statements, establish that it was plausible that TLS made false statements to recruiters that

were similar to what it had told the TP Entities.

### (b)    If the statements are capable of sustaining a defamatory meaning

The court must determine whether an alleged statement is capable of sustaining a

defamatory meaning; if the answer is yes, then the trier of fact must determine whether the

audience in fact perceived it as defamatory.  West v. Thomson Newspapers, 872 P.2d 999,

1008–09 (Utah 1994).  A statement is defamatory if it impeaches an individual's honesty,

integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt or

ridicule.  Id. at 1008 & n.14.  Traditionally, in the common law, defamatory statements were

those that

> imput[ed] to the plaintiff (1) "a serious crime involving moral
> turpitude or a felony"; (2) a character trait showing unfitness for
> one's "business, trade, or profession"; (3) acts or views contrary to
> a "deeply held moral standard of the community"; and (4) physical
> or other traits that would cause others to shun the plaintiff.

Hogan v. Winder, 762 F.3d 1096, 1106 (10th Cir. 2014) (quoting Dan B. Dobbs, Paul T. Hayden

& Ellen M. Bublick, The Law of Torts § 525 (2d ed. 2014)).  The statement must be damaging to

at least a substantial and respectable minority of the audience.  West, 872 P.2d at 1009 & n.16.

A court must assess the context in which the statement was given.  Hogan, 762 F.3d at 1106

(citing O'Connor v. Burningham, 165 P.3d 1214, 1221–22 (Utah 2007)).  The court, in its

evaluation, should examine the words and their implications; the entire article or message; the

events or disputes that gave rise to the article; and the likely effect on the reasonable audience.

Id.  And when the statements characterize a claimants' work performance, the statements must

not be too vague or subjective, the statements must be specific.  Id. at 1107 (citing Einhorn v.

LaChance, 823 S.W.2d 405, 411 (Tex. Ct. App. 1992)).

 In Hogan, the court held that statements that the claimant had "performance issues" and

exhibited "erratic behavior" were too vague to be defamatory in the context of the dispute

between the parties.  Id. at 1106–07.  Similarly, in B.J. Barnes & Sons Trucking, Inc. v. Dairy

Farmers of America, Inc., No. 2:05-cv-351-BSJ, 2006 WL 1472689 (D. Utah May 22, 2006), the

court found that statements that the claimant "was not doing a very good job" and "all the

problems . . . were the fault of" the claimant were incapable of defamatory meaning because they

were subjective opinion and were generalized attributions of fault.  Id. at *3.

 What TLS allegedly stated was capable of being perceived as defamatory.  Statements

that NuCloud had caused server outages, failed to supply a working backup systems for those

servers, and failed to perform assigned tasks could damage NuCloud's business reputation.  The

same is true for the statements TLS made to the recruiters—that NuCloud failed to perform work

for a major European project, caused multiple software failure, and faced dissolution.  These

comments if made to recruiters or potential clients would be damaging to a high-tech

professional.  If the audience understood the full context of the TLS-NuCloud relationship, the

statements would still be damaging, maybe even more so.  The language was not hyperbolic,

loose, or figurative, and an audience would not likely interpret it as subjective opinion.  Instead,

for the most part, the statements were objective and could be proved or disproved.  Additionally,

they were more concrete and particularized than the statements made in <u>Hogan</u> or <u>B.J. Barnes</u>.

### (c)    Common-interest qualified privilege

TLS contends that even if the statements were defamatory, it is protected by the

common-interest privilege.  Certain statements are "conditionally privileged if made to advance

a legitimate common interest between the publisher and the recipient."  <u>Thomas v. Pacificorp</u>,

324 F.3d 1176, 1179–80 (10th Cir. 2003) (quoting <u>Brehany v. Nordstrom, Inc.</u>, 812 P.2d 49, 58

(Utah 1991)).  Generally, this conditional privilege allows people to defame others so long as

their statements are communicated to someone with whom they share a common-interest.  For

example an, in <u>Brehany</u>, an employer was allowed to tell its store managers that employee's

terminations were drug-related.  812 P.2d at 58–59.  But the qualified privilege does not protect

communications when the defamer (1) made the same statements to people beyond the common-

interest relationship; (2) made the statements while knowing they are false (or with reckless

disregard about their falsity); or (3) made the statements with malice.  <u>Ferguson v. Williams &</u>

<u>Hunt, Inc.</u>, 221 P.3d 205, 212 & n.1, 214 (Utah 2009); <u>Thomas</u>, 324 F.3d at 1180–81.  Indeed, if

the defamer makes one of these three types of statements, the courts have classified it as an

abuse of the privilege and then the privilege does not protect any of the defamatory

communications.   <u>Ferguson</u>, 221 P.3d at 212 & n.1; <u>Thomas</u>, 324 F.3d at 1180;

Here, TLS and the TP Entities have joint business ventures that are legitimate common

interests.  NuCloud alleges, in the proposed Third Amended Counterclaim, that even though

some of the communications occurred between the companies and in furtherance of their joint

business, TLS cannot be protected by the conditional privilege for two reasons.  First, NuCloud

12

contends that TLS made in essence the same statements to non-TP Entity companies (like Source8 and Execis) that TLS had made to the TP Entities.  Based on the allegations, there are no common interests between TLS and the other companies.  The TLS statements made to the recruiters are similarly outside the scope of the privilege.  Second, NuCloud alleges that TLS made the statements while knowing that they were false.  NuCloud gives some concrete examples; for example, TLS initially acknowledged that the "high-availability function" worked perfectly only later did it say that NuCloud failed to supply that function.  Either alleged abuse of the privilege forecloses TLS's claimed defense, so the court need not address whether NuCloud showed that TLS acted with malice.

### (d)        Pleading special damages

Generally, a party must allege special damages for a defamation claim.  Allred v. Cook, 590 P.2d 318, 320–21 (Utah 1979).  "Special damages are a particular type of damages which are a natural consequence of the injury caused but are not the type of damages that necessarily flow from the harmful act."  Judge v. Saltz Plastic Surgery, PC, 330 P.3d 126, 132 (Utah Ct. App. 2014) (quoting Hodges v. Gibson Prods. Co., 811 P.2d 151, 162 (Utah 1991)); Cohn v. J.C. Penney Co., 537 P.2d 306, 308 (Utah 1975) ("The term 'special damages' denotes such damages as arise from the special circumstances of the case, which, if properly pleaded, may be added to the general damages which the law presumes or implies from the mere invasion of the plaintiff's rights."); accord Weyerhaeuser Co. v. Brantley, 510 F.3d 1256, 1266 (10th Cir. 2007).  Under Rule 9(g) of the Federal Rules of Civil Procedure, "[i]f an item of special damage is claimed, it must be specifically stated."  A claimant is not required to plead special damages with particularity, which Rule 9(b) requires when pleading fraud.  Compliance with Rule 9(g) gives

the opposing party "an adequate opportunity to defend against" the different theories of recovery.  Hodges, 811 P.2d at 162 (analyzing Utah Rule of Civil Procedure 9(g), which is almost identical to the federal rule).

In Weyerhaeuser, the plaintiff did not allege any special damages in its initial pleading despite the Rule 9(g) mandate.  510 F.3d at 1266.  The defendant moved for dismissal, to which the plaintiff, in its opposition memorandum, proposed "lost profits" as its special damages it sought.  Id.  It was not until the pretrial order that the plaintiff officially amended the pleading to include the special damages.  Id. at 1266–67.  In that case, the Court of Appeals for the Tenth Circuit held that the trial court did not abuse its discretion in allowing such a late amendment to the pleading.  Id. at 1267.

In Lott v. Levitt, 556 F.3d 564 (7th Cir. 2009), the court upheld the trial court's dismissal and refusal to allow an amendment of a defamation claim because the claimant failed to specifically state special damages.  Id. at 570.  In the original complaint, the plaintiff "alleged only 'substantial reputational and monetary damages.'"  Id.  The proposed amendment's damage statements were equally vague.  The plaintiff added that people told him that they understood the alleged defamatory statement "to be a swipe at his professional reputation" but the allegations did "not describe what pecuniary losses he suffered as a result."  Id.  "Such general allegations, which make no effort to explain how any reputational damage translated into actual harm, are not enough."  Id.

Similarly, in Action Repair, Inc. v. American Broadcast Companies, Inc., 776 F.2d 143 (7th Cir. 1985), the court held that the allegation that Action Repair "suffered losses in excess of

$1,000,000" was inadequate for a defamation-*per-quod* claim.[4]  <u>Id.</u> at 149.  The court concluded,

"This does not constitute a sufficient statement of special damages . . . .  Although an estimation

of final total dollar amounts lost is unnecessary . . . the pleading must demonstrate some actual

pecuniary loss."  <u>Id.</u>

In this lawsuit, and at this stage, the meaningful question is whether NuCloud is

sufficiently notifying TLS of the special damages it seeks.  Paragraph 298 reads, "NuCloud's

reputation has been tarnished, and it has lost reasonably expected business opportunities both

through the cessation of negotiations with other companies about future ventures and because

NuCloud employees have sought to disassociate themselves from NuCloud."  (Proposed 3d Am.

Countercl. ¶ 298.)  Although NuCloud does not use words like "lost profits," it is clear that this

is what it means.  NuCloud seeks recovery of money for lost opportunities with the TP Entities

and non-TP Entities with whom it was negotiating.  It also seeks to recover money for the lost

opportunities caused by employees leaving the company in addition to what it spent "to retain

employees who were contacted by recruiters." (<u>Id.</u> ¶ 295(C)(x).)  NuCloud includes sufficient

statements of special damages.  So the court need not analyze whether the allegedly defamatory

statements would have been defamation per se, which does not require allegation of special

damages.  <u>Allred</u>, 590 P.2d at 320–21.

---

[4] "Statements are considered defamatory *per quod* if the defamatory character of the
statement is not apparent on its face, and extrinsic facts are required to explain its defamatory
meaning."  <u>Kolegas v. Heftel Broad. Corp.</u>, 607 N.E.2d 201, 206 (1992).  For *per quod*
defamation, claimants still must plead special damages.  <u>Action Repair</u>, 776 F.2d at 149.

### 2.     Tortious intentional interference with business relations

To recover for tortious interference, a claimant must prove "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff."  Eldridge v. Johndrow, 345 P.3d 553, 556, 564–65 (Utah 2015).  Both parties agree that the only valid basis for the improper-means element would be defamation.  Because the court will allow NuCloud to amend its defamation claim, the tortious-interference claim can also go forward.

### 3.     Violation of § 1201(a)(1) the Digital Millennium Copyright Act

NuCloud alleges, in the proposed Third Amended Counterclaim, that TLS violated the Digital Millennium Copyright Act (DMCA), 17 U.S.C. §§ 1201–1205, when TLS found a way to circumvent NuCloud's URL entry point (which was a website that provided restricted access to the proprietary software).  NuCloud's proprietary software supposedly relied on the URL entry point as well as router configurations and other software code.  After gaining access to the proprietary software through the website, TLS allegedly reverse engineered a way for the software to be disconnected from the website and router configurations.  After TLS detached the software from the URL entry point, TLS blocked NuCloud's access to the software.

One of Congress's goals in enacting the DMCA was to target the circumvention of technological protective measures.  MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc., 622 F.3d 361, 365 (5th Cir. 2010) (citing Davidson & Assocs. v. Jung, 422 F.3d 630, 639–40 (8th Cir.2005)).  The Act declares a person must not "circumvent a technological measure that effectively controls access to work protected under this title."  17 U.S.C. § 1201(a)(1)(A).  To "circumvent a technological measure" meas "to descramble a scrambled work, to decrypt an

encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological

measure, without the authority of the copyright owner." Id. § 1201(a)(3)(A).  Congress

explained, "a technological measure 'effectively controls access to a work' if the measure, in the

ordinary course of its operation, requires the application of information, or a process or a

treatment, with the authority of the copyright owner, to gain access to the work." Id. §

1201(a)(3)(B) (emphasis added).

 Section 1201(a)(1)(A) prohibits only efforts to circumvent the technological measure, it

does not prohibit and subsequent use of a copyrighted work.  MGE UPS Sys., 622 F.3d at 366.

Other well-established prohibitions on uses or abuses of copyrighted material exist outside the

DMCA.  Id.  Circumventing a technological measure, as Congress described it leading up to the

DMCA's passage, is "the electronic equivalent of breaking into a locked room in order to obtain

a copy of a book."  H.R. Rep. No. 105–551, pt. 1, at 17 (1998) quoted with approval in Universal

City Studios, Inc. v. Reimerdes, 111 F. Supp. 2d 294, 316 (S.D.N.Y. 2000) aff'd sub nom.

Universal City Studios, Inc. v. Corley, 273 F.3d 429 (2d Cir. 2001).  Using this analogy, the

statute strengthens the room's security system, but does not affect the separate and already-

existing legal protections against copying, and other uses of, the book.  Corley, 273 F.3d at 443

("[T]he DMCA targets the circumvention of digital walls guarding copyrighted material (and

trafficking in circumvention tools), but does not concern itself with the use of those materials

after circumvention has occurred." (emphases in original)).

 Congress explained, "Paragraph (a)(1) does not apply to the subsequent actions of a

person once he or she has obtained authorized access to a copy of a work protected under Title

17, even if such actions involve circumvention of additional forms of technological protection

measures." H.R. Rep. No. 105–551, pt. 1, at 18 (emphasis added); S. Rep. No. 105-190, at 28. By this logic, once a person obtains a copy of the work through authorized access, it would no longer matter if the person circumvents technological measures that protect the original (or another copy) of the work.[5]

At least one court has found a defendant liable for violating § 1201(a)(1) even though he already had a copy of the original work. Pearl Investments, LLC v. Standard I/O, Inc., 257 F. Supp. 2d 326 (D. Me. 2003). In Pearl, the court held that a defendant violated the section by gaining access to the plaintiff's protected Virtual Private Network (VPN) through a "tunnel" that the defendant created. Id. at 349. The defendant already had access to the copyrighted work. Id. at 350 ("[H]e had written the software . . . and maintained a backup file of it . . . ."). The possession of a copy of the work did not exempt him from the prohibition against bypassing the technological measures.

This court could find no decision that contradicted the Pearl holding. Courts have allowed defendants to alter or damage the copyrighted work without violating § 1201(a)(1), but courts have not permitted a defendant's altering or reverse engineering the protective measures. In Lexmark International, Inc. v. Static Control Components, Inc., 387 F.3d 522 (6th Cir. 2004), the court held that no technological measure was circumvented because anyone who bought a Lexmark printer could "read the literal code . . . directly from the printer memory, with or without the benefit of the authentication sequence . . . ." Id. at 546. The court held that "[n]o security device . . . protect[ed] access to the . . . [c]ode and no security device accordingly must

---

[5] This language found in the legislative history significantly qualifies the statutory language found in § 1201(a)(1), but as will be discussed below, this distinction is not dispositive here because TLS did not obtain a copy of the software free from the technological measures.

18

be circumvented to obtain access to that program code." Id. at 547.  The court did not say that technological measures could be circumvented; it said only that no technological measures protected the work.

In Davidson & Associates, the Court of Appeals for the Eighth Circuit held that § 1201(a)(1) was violated when defendants obtained a copy (or used a copy) by reverse engineering a method to circumvent the technological measures.  422 F.3d at 640–41.  In that case, the claimant's technological measure was a "secret handshake" between its server and the consumers who gained access to the server to play a multi-user video game.  Id. at 640.  The defendants created an alternative server by reverse engineering and overcoming the secret-handshake mechanism.  Id. at 641.  The alternative circumvented the protective measure by allowing numerous players to acquire access and use the protected work without performing the secret handshake

And most recently, in LivePerson, Inc. v. 24/7 Customer, Inc., 83 F. Supp. 3d 501 (S.D.N.Y. 2015), the court explained that reverse engineering of a copyrighted work does not violate § 1201(a)(1), as it would if a person reverse engineered the technological measures.  Id. at 510.  This also conforms to the holding in Ground Zero Museum Workshop v. Wilson, 813 F. Supp. 2d 678 (D. Md. 2011).  That court held that a former manager of a museum's website did not circumvent a technological measure by using an expired or unauthorized password when he deleted some of the museums files and redirected the website to a critical New York Post article.  Id. at 691–92.[6]  Being able to reverse engineer or delete the copyrighted work does not

_____

[6] Other courts have similarly held that using an expired, unauthorized, or stolen password (or one obtained through fraud and deceit) to acquire access is not a violation of § 1201(a)(1). Dish Network LLC v. World Cable Inc., 893 F. Supp. 2d 452, 465 (E.D.N.Y. 2012); Navistar,

contravene the <u>Davidson & Associates</u> holding, which said that a person must not reverse engineer and overcome the technological measure.  422 F.3d at 640–41.

Here, and according to the allegations within the proposed Third Amended Counterclaim, NuCloud allowed TLS to gain access to the software code only through its URL entry point.  To function correctly, the proprietary software relied on the URL entry point, certain router configurations, and other pre-existing software, which all functioned as technological measures protecting the software code.  And notably, TLS did not possess an alternative copy of the code.  TLS could obtain access to the software only through the NuCloud-controlled URL entry point until TLS reverse engineered the software to free it from its dependency on the URL entry point and other technological measures.  Because TLS removed these measures from the protected software, it effectively avoided, bypassed, removed, deactivated, or impaired those technological measures.  To adopt Congress's analogy of the locked room with a book inside, TLS entered the room with a key provided by NuCloud and then proceeded to change the locks so that NuCloud could no longer gain access or lock the room.  It should not matter, either from a textualist or from a public-policy perspective, whether the changing of the locks happened from outside or inside the room.  NuCloud's proposed allegations could support a conclusion that TLS violated § 1201(a)(1).

---

Inc. v. New Balt. Garage, Inc., No. 11-cv-6269, 2012 WL 4338816, at *4 (N.D. Ill. Sept. 20, 2012); <u>Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey</u>, 497 F. Supp. 2d 627, 645 (E.D. Pa. 2007); <u>Egilman v. Keller & Heckman, LLP.</u>, 401 F. Supp. 2d 105, 113 (D.D.C. 2005); <u>I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.</u>, 307 F. Supp. 2d 521, 532 (S.D.N.Y. 2004).

####         4.         Fraudulent inducement

The TP Entities criticize three aspects of the fraudulent-inducement claim: first, that NuCloud's proposed allegations do not specify who made representations and what was represented; second, that representations about a present intent to perform under a contract cannot satisfy the "presently existing material fact" requirement; and third, that the proposed counterclaim contains insufficient facts to establish NuCloud's reasonable reliance on any statements from TLS's sister corporations, TPUSA and Teleperformance Group.

To prevail on a fraudulent-inducement claim, NuCloud must allege:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

Daines v. Vincent, 190 P.3d 1269, 1279 (Utah 2008) (quoting Armed Forces Ins. Exch. v. Harrison, 70 P.3d 35, 40 (Utah 2003)).  And NuCloud must allege those circumstances—other than a person's state of mind—with particularity.  Fed. R. Civ. P. 9(b).  Allegations may be based on the claimant's belief if two conditions are satisfied—first, the facts in question are peculiarly within the opponent's knowledge, and second, the pleading sets forth the factual basis for the claimant's belief.  Koch v. Koch Indus., Inc., 203 F.3d 1202, 1237 (10th Cir. 2000) (quoting Scheidt v. Klein, 956 F.2d 963, 967 (10th Cir. 1992)).

The purpose of Rule 9(b) is to give the opponent fair notice of the claims it faces "and the factual ground upon which [those claims] are based."  Id. at 1236 (quoting Farlow v. Peat,

Marwick, Mitchell & Co., 956 F.2d 982, 987 (10th Cir. 1992)) (quotation marks omitted).  To

state circumstances with particularity, a party alleging fraud must "set forth the time, place and

contents of the false representation, the identity of the party making the false statements[,] and

the consequences thereof."  Id. (quoting Lawrence Nat'l Bank v. Edmonds (In re Edmonds), 924

F.2d 176, 180 (10th Cir. 1991)) (quotation marks omitted).  The rule demands that a claimant

allege the "'who, what, when, where and how' of an alleged fraud."  U.S. ex rel. Sikkenga v.

Regence Bluecross Blueshield, 472 F.3d 702, 727 (10th Cir. 2006) (quoting Thompson v.

Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1997)).

### (a)      Who made representations and what was represented

NuCloud asserts that the TP Entities fraudulently induced it to enter into both the SAMR

and the Services Agreement.  In its proposed Third Amended Counterclaim, NuCloud alleges

that executives for the TP Entities, Mr. Welch and Mr. Mudaliar, told NuCloud's Harry Haury

that the TP Entities controlled TLS, that they would continue to control TLS, and that they

would ensure that TLS would comply with the agreements.

The TP Entities first argue that NuCloud has failed to allege with particularity that Mr.

Welch and Mr. Mudaliar were agents who could speak for the TP Entities.  Then the TP Entities

argue that NuCloud fails to plead facts about what representation were made with sufficient

particularity.  The court will address both issues in turn.

First, when a claimant alleges that the speaker acted as an agent of a principal, the

Rule 9(b) particularity requirements apply only if the issue of agency is an integral part of the

material fact that was misrepresented to the claimant.  Abels v. Farmers Commodities Corp., 259

F.3d 910, 917 (8th Cir. 2001) (quoting Lachmund v. ADM Inv'r Servs., Inc., 191 F.3d 777,

782–83 (7th Cir. 1999)).  Here, Mr. Welch and Mr. Mudaliar's supposed agency for the

TP Entities is not an integral part of the alleged fraud.  NuCloud does not complain that the two

men misrepresented their authority to act for a TP Entity.  So, to plead agency, NuCloud must

comply only with Rule 8 of the Federal Rules of Civil Procedure.

To be an agent, a person must be authorized by the principal to act on its behalf and to be

subject to its control.  Stamper v. Johnson, 232 P.3d 514, 518 (Utah 2010)(citing Gildea v.

Guardian Title Co., 970 P.2d 1265, 1269 (Utah 1998)).  The principal must manifest its consent

in some way.  Id.  "Whether an agency relationship exists depends upon all the facts and

circumstances of the case."  Id. (quoting Gildea, 970 P.2d at 1269) (quotation marks omitted).

In the proposed Third Amended Counterclaim, NuCloud sufficiently alleges that Mr.

Welch and Mr. Mudaliar were agents for each of the three TP Entities.  Paragraph 240 of the

proposed Third Amended Counterclaim has statements allegedly made by both men about their

authority and their positions within each of the TP Entities.  Mr. Welch said he was the Chief

Operating Officer of both Teleperformance and TPUSA, and had held a similar role with

Teleperformance Group.  Mr. Welch also said he was authorized to negotiate for the TP Entities

and TLS.  At an October 2014 meeting, Mr. Mudaliar said he was the Chief Information Officer

for both Teleperformance and TPUSA and maintained a similar role with Teleperformance

Group.  Again, Mr. Mudaliar told NuCloud that he was authorized to negotiate for all four

companies.  All of these representations were consistent with Mr. Welch and Mr. Mudaliar's

previous and subsequent representations.  Furthermore, two TLS's Chief Executive Officer,

Bertrand Weisgerber, and IT Director, Stuart Curran, "were present at this meeting and did not

dispute these representations" by Mr. Welch and Mr. Mudaliar.  (Proposed 3d Am. Countercl. ¶¶ 240(g), 273(g).)

NuCloud also alleges that Teleperformance's public website listed Mr. Welch as the company's Chief Operations Officer.  Mr. Welch's LinkedIn.com profile said the same and that he had been the Chief Executive Officer of TPUSA.  Mr. Mudaliar's LinkedIn.com profile listed him as the Chief Information Officer for TPUSA as well.  (Id. ¶ 83.)

In December 2013, during a meeting at TPUSA's offices in Salt Lake City, Dominic Dato, the Chief Executive Officer of TPUSA, told Mr. Haury that Mr. Welch and Mr. Mudaliar supervised TLS's operations and that Mr. Haury could address any problem "with either or both of them."  (Id. ¶ 84.)  Mr. Dato, by making that statement, implied that Mr. Welch and Mr. Mudaliar could speak for TPUSA and that TPUSA had some control over TLS.

In December 2014, an attorney for Teleperformance, Wade Lyons, who was negotiating the Services Agreement, told NuCloud that Teleperformance and Teleperformance Group were interested in owning the copyrighted software.  (Id. ¶ 108.)  He "also noted that [the] '[intellectual property] acquired will be owned by TPUSA not [Teleperformance Group].'"  (Id.) Implicit in this statement is that Teleperformance Group and TPUSA were represented in the negotiations, by Mr. Welch and Mr. Mudaliar.  And in February 2015, Olivier Rigaudy, the Chief Financial Officer of Teleperformance, "confirmed with Mr. Haury in two separate telephone calls that [Mr.] Welch and [Mr.] Mudaliar held executive positions within Teleperformance, [TPUSA], and [Teleperformance Group], and that they were in charge of TLS."  (Id. ¶ 87.)

The court finds that NuCloud has adequately pleaded enough facts to establish that Mr. Welch and Mr. Mudaliar were agents for each TP Entity.

The court similarly finds that NuCloud pleaded the statements that TLS supposedly made with sufficient particularity in the proposed Third Amended Counterclaim.  TLS argues that NuCloud must articulate the allegedly fraudulent statements with particularity.  NuCloud alleges that during a late 2014 meeting Mr. Welch and Mr. Mudaliar represented to Mr. Haury that the TP Entities maintained full control over the actions and business of TLS and that they could be trusted to make sure TLS would comply with the SAMR and Services Agreement.  In a November 2014 phone call, Mr. Welch assured Mr. Haury that TLS's executives were "no longer part of the equation" and that the TP Entities were in control.  (Id. ¶ 98.)  During a subsequent phone call, Mr. Mudaliar told Mr. Haury that "TLS would do what we tell them to do."  (Id. ¶¶ 101–102.)  Besides the representations that the TP Entities would control TLS and that TLS would comply with the contracts, the TP Entities represented to Mr. Haury that they would favorably consider NuCloud for future contract work independent of the TLS relationship. (Id. ¶¶ 102, 109.)

### (b)      Presently existing material fact

The TP Entities argue (1) that representations about one's intent to comply with a contract cannot satisfy the "presently existing material fact" element, (2) that evidence of a subsequent breach is insufficient to prove the falsity of such representations, and (3) that fraudulent inducement cannot be pleaded simultaneously with a breach-of-contract claim.

"[A] promise of future performance, when made with a present intent not to perform and made to induce a party to act in reliance on that promise, constitutes actionable . . . fraud."  Von

25

Hake v. Thomas, 705 P.2d 766, 770 & n.2 (Utah 1985) (questioning whether the counsel who opposed this conclusion violated Rule 40 of the Utah Rules of Appellate Procedure because the argument was so "devoid of merit"), cited with approval in Webster v. JP Morgan Chase Bank, NA, 290 P.3d 930, 936 (Utah Ct. App. 2012).  "It is settled that a misrepresentation of present promissory intention is a misrepresentation of presently existing fact."  Alta Health Strategies, Inc. v. Kennedy, 790 F. Supp. 1085, 1094 (D. Utah 1992); Maack v. Res. Design & Const., Inc., 875 P.2d 570, 584 (Utah Ct. App. 1994) (same), abrogated on other grounds by Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC, 221 P.3d 234 (Utah 2009); Galloway v. Afco Dev. Corp., 777 P.2d 506, 508 (Utah Ct. App. 1989); see also Andalex Res., Inc. v. Myers, 871 P.2d 1041, 1047 (Utah Ct. App. 1994) ("A misrepresentation of intended future performance is not a 'presently existing fact' upon which a claim for fraud can be based unless a [claimant] can prove that the representor, at the time of the representation, did not intend to perform the promise and made the representation for the purpose of deceiving the promisee.").  Also, "[i]t does not matter, for purposes of the temporal presence of the representation, whether the promisor is the same person as the representor."  Galloway, 777 P.2d at 508 n.3.

The TP Entities argue that the fact that a party breaches a contract does not, by itself, prove the breaching "party's intentions or state of mind when negotiating a contract" and that "intent not to perform a promise cannot be inferred merely from" non-performance.  (Mem. Opp'n Mot. Am. 16, ECF No. 46 (quoting, respectively, Berthel Land & Livestock v. Rockies Exp. Pipeline LLC, 275 P.3d 423, 438 (Wyo. 2012); Brown v. Lockwood, 76 A.D.2d 721, 732–33 (N.Y. App. Div. 1980)).)

Here, NuCloud alleges the Mr. Welch and Mr. Mudaliar assured NuCloud that the TP Entities had control and would exercise that control to ensure that TLS would comply with the SAMR and Services Agreement.[7] See supra Part I.A.  To support its conclusion, NuCloud alleges more than the fact that TLS breached the agreements.  Allegedly, multiple breaches occurred almost immediately after formation—TLS withdrew work within a week of signing the agreements, it quickly blocked access to parts of the software, and within six weeks it failed to make timely payments.  (Proposed 3d Am. Countercl. ¶¶ 146–49, 156–58, 166–67, 326.)  The temporal proximity between formation and the multiple breaches creates a reasonable inference that the TP Entities had no intent to honor their assurances and that TLS had no intent to comply with the contracts.  The Utah Supreme Court made a similar inference based on temporal proximity.  See Cerritos Trucking Co. v. Utah Venture No. 1, 645 P.2d 608, 611 (Utah 1982) ("The evidence reflects nothing but good faith on [the representor's] part and that it was not until several months after the option was granted that the [representor's] parent company . . . disapproved of the plan . . . to participate which led to its abandonment." (emphasis added)).  And in the Tenth Circuit, temporal proximity by itself can establish a prima facie case of causation for an employee retaliation claim.  Conroy v. Vilsack, 707 F.3d 1163, 1181 (10th Cir. 2013) ("[I]f the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference . . . .").  If TLS or the TP Entities represented that they had the intent to perform but soon failed to perform, that is a reasonable basis to infer that none of the four companies truly had the present intent to perform.

---

[7] They also allegedly represented that the TP Entities would favorably consider NuCloud for future contract work.

27

In addition to relying on the short time between formation and breach, NuCloud also alleges that TLS already had other personnel or companies performing NuCloud's work and quickly defamed NuCloud while it reverse engineered ways to circumvent NuCloud's measures that protected the software.  (Proposed 3d Am. Countercl. ¶¶ 156–59, 244, 278, 326.)  And whereas in the past Mr. Welch and Mr. Mudaliar would intervene to try to counsel the relationship between TLS and NuCloud; this time, no one at the TP Entities tried to intervene and amend the breaches.  With these allegations, NuCloud adequately pleads misrepresentation of a presently existing material fact.

TLS also maintains that NuCloud could not bring a claim fraudulent inducement and breach of contract at the same time.  TLS cites <u>Reynolds v. Tice</u>, 595 P.2d 1318, 1324 (Wyo. 1979), and <u>Telecom International America, Ltd. v. AT & T Corp.</u>, 280 F.3d 175, 196 (2d Cir. 2001), for the proposition that promising to abide by future contractual obligations cannot support a fraudulent-inducement claim.  Neither case's holding supports that proposition.  The Wyoming Supreme Court, in <u>Reynolds</u>, concluded that a jury could not award compensatory damages for fraud and again for a breach-of-contract claim.  595 P.2d at 1324.  A holding about the impermissibility of double recovery does not answer the question of whether the two claims could be pleaded together or if proof of one could support the other.  Similarly, the <u>Telecom</u> court held that New York law bars fraud claims that arise from the same facts as a breach-of-contract claim with the sole addition of an allegation that the opponent never intended to perform its contractual duties.  <u>Id.</u>  Under New York law, the fraud claim would be duplicative of the breach claim and would not be entertained.  <u>Id.</u>  But in this case, as discussed above, NuCloud has made allegations that imply TLS or the TP Entities never intended to perform.

Moreover, Utah law differs from the New York law applied in <u>Telecom</u>.  In <u>Moore v. Smith</u>, 158 P.3d 562 (Utah Ct. App. 2007), the court reinstated a negligent-misrepresentation claim that was brought concurrently with a breach-of-contract claim.  <u>Id.</u> at 574–75.  There, Defendant Smith, who was a general contractor, "never intended to remedy the defects in the house"; this was equivalent to a party never intending to comply with the contract.  <u>Id.</u>  The court reinstated the claim for negligent misrepresentation and remanded even though the claim might have been redundant with fraudulent misrepresentation.  <u>Id.</u> at 575.  Although those two claims and a breach-of-contract claim might be duplicative of one another, a party is not prohibited from pleading all three together even if the only material fact inducing reliance would be that the defendant had no intention to comply with the contract.  <u>Id.</u>

Here, NuCloud alleges that the TP Entities falsely assured NuCloud that TLS would comply with the agreements and that the TP Entities would force TLS to do so.  Even though NuCloud will not be able to double its potential damages award, it is entitled to pursue those two theories.

### (c)    Reasonable reliance

For fraudulent inducement, a claimant must also plead that it reasonably relied on the allegedly fraudulent representation.  The TP Entities give two reasons why NuCloud could not have relied on certain representations.  First, the TP Entities argue that NuCloud could not have reasonably relied on representations made by TPUSA or Teleperformance Group because each company was merely a sister corporation to TLS and not a parent corporation.  Second, the TP Entities assert that Teleperformance's refusal to guaranty NuCloud's commitments precludes reasonable reliance.

"[T]he question of reasonable reliance is usually a matter within the province of the jury, [but] there are instances where courts may conclude that, as a matter of law, there was no reasonable reliance." Armed Forces Ins. Exch. v. Harrison, 70 P.3d 35, 45 (Utah 2003) (quoting Gold Standard, Inc. v. Getty Oil Co., 915 P.2d 1060, 1067 (Utah 1996)) (quotation marks omitted).  In Armed Forces, the plaintiff alleged that it relied on a document of which the plaintiff was completely unaware until after the litigation began, and although the document had inaccuracies, the plaintiff knew full well that they existed (that is, after it discovered the document).  Id.  That is a good example of how reliance could not exist as a matter of law.

Here, the pleaded facts are different.  The alleged representations of Mr. Welch, Mr. Mudaliar, Mr. Lyons, and Mr. Dato could lead to a reasonable conclusion that each TP Entity had an interest in the TLS-NuCloud relationship and their work.  Mr. Welch and Mr. Mudaliar were executives of each TP Entity.  They also represented that they could and would control TLS and had done so in the past.  Mr. Lyons, an attorney for Teleperformance, told NuCloud that TPUSA and Teleperformance Group wanted intellectual-property rights in the developed software.  (Proposed 3d Am. Countercl. ¶ 108.)  And Mr. Dato, an executive for TPUSA, told NuCloud that Mr. Welch and Mr. Mudaliar could address any of NuCloud's concerns.  (Id. ¶ 84.)  It is plausible that NuCloud reasonably relied on those representations.

Similarly, Teleperformance's refusal to guaranty TLS's performance does not mean that NuCloud unreasonably relied on the alleged misrepresentations.  Teleperformance's refusal to guaranty TLS is a factor that the factfinder could consider in determining whether NuCloud's reliance was reasonable.

**C.    The negligent-misrepresentation claim, which NuCloud seeks to add**

NuCloud seeks to add a negligent misrepresentation claim with supporting factual allegations.  To recover for negligent misrepresentation, a claimant must show: "(1) the plaintiffs reasonably relied on the defendant's representation, (2) the representation constitutes a careless or negligent misrepresentation of a material fact, (3) the defendant had a pecuniary interest in the transaction, (4) the defendant was in a superior position to know the material facts, and (5) the defendant should have reasonably foreseen that the injured party was likely to rely upon the misrepresentation."  Andersen v. Homecomings Fin., LLC, No. 2:11-cv-332-TS, 2011 WL 3626828, at *3 (D. Utah Aug. 17, 2011); Hafen v. Strebeck, 338 F. Supp. 2d 1257, 1264 (D. Utah 2004); Price-Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc., 713 P.2d 55, 59 (Utah 1986).  As part of this test, a claimant must establish that its opponent had a duty to disclose a material fact.  Hafen, 338 F. Supp. 2d at 1264–65; Smith v. Frandsen, 94 P.3d 919, 923 (Utah 2004) ("[A] duty to disclose is a necessary element of the tort of negligent misrepresentation."), cited with approval in Aclys Int'l v. Equifax, 438 F. App'x 689, 692 (10th Cir. 2011).

The question of whether someone owes another a duty of care is a question of law left to the court.  Hafen, 338 F. Supp. 2d at 1265 (quoting Ferree v. State, 784 P.2d 149, 151 (Utah 1989)).  Multiple factors, none of which are dispositive, may be considered to determine whether a duty exists between parties.  Id.  Courts consider "the legal relationship between the parties, the foreseeability of injury, the likelihood of injury, public policy as to which party can best bear the loss occasioned by the injury, and other general policy considerations."  Normandeau v. Hanson Equip., Inc., 215 P.3d 152, 158 (Utah 2009).

Although a negotiator has "an inherent duty to be honest and not state intentional misrepresentations, there is no similar duty with respect to negligent misrepresentations when the parties are dealing at arm's length."  Hafen, 338 F. Supp. 2d at 1265, quoted with approval in Kirk v. Collins, No. 2:12-cv-01107, 2015 WL 730028, at *10 (D. Utah Feb. 19, 2015).  Two Utah courts have recognized a duty to "use reasonable care to not mislead," Christenson v. Commonwealth Land Title Ins. Co., 666 P.2d 302, 306 (Utah 1983), or "reasonably assure the accuracy of what is represented," Galloway v. Afco Dev. Corp., 777 P.2d 506, 509 (Utah Ct. App. 1989).  In Christenson, the party making the representation was a title company acting as an escrow agent who had a duty to keep certain records that later became the focus of one of its misrepresentation.  666 P.2d at 305–06.  And in Galloway, it was a real estate agent who understood far better than the claimant whether the security was adequate for the investment making the representations.

In this case, the TP Entities were not like the title company or real estate agent who would be in a superior position to understand the facts and what they meant.  As NuCloud alleges, the TP Entities "negotiated the terms of the SAMR and Services Agreement; they were not neutral mediators.  NuCloud was not dealing at arm's length with an uninvolved, third-party broker.  NuCloud was working with the parent and sister corporations involved in the UKVI Contract and interest in its success . . . ."  (Reply Mem. Supp. Mot. Am. 6–7, ECF No. 49.)  The TP Entities were active negotiators.

In addition to NuCloud not establishing that the TP Entities owed it a duty of care, the TP Entities argue that amending the negligent-misrepresentation counterclaim would be futile because of the economic-loss rule.  The economic-loss rule "bars recovery of economic losses in

negligence actions unless the [claimant] can show physical damage to other property or bodily

injury." Sunridge Dev. Corp. v. RB & G Eng'g, Inc., 230 P.3d 1000, 1006 (Utah 2010), quoted

with approval in Aclys Int'l, 438 F. App'x at 691.  The rule is the "boundary between contract

law, which protects expectancy interests created through agreement between the parties, and tort

law, which protects individuals and their property from physical harm by imposing a duty of

reasonable care." Sunridge Dev., 230 P.3d at 1006.  When the line between contract and tort

blurs, the court must decide "whether a duty exists independent of any contractual obligation."

Hermansen v. Tasulis, 48 P.3d 235, 240 (Utah 2002).  And if a party has an independent duty

outside of the contract, then the tort claim survives because it "does not fall within the scope of

the rule."  Id., quoted with approval by Hafen, 338 F. Supp. 2d at 1266.

Although at one time the rule prevented only contracting parties from seeking certain tort

remedies in addition to the already available contract remedies, the Utah Supreme Court has now

held that the rule also applies to non-contracting parties as well.  Davencourt at Pilgrims

Landing, 221 P.3d at 243.  Although the TP Entities never established a contractual relationship

with NuCloud, the economic-loss rule still bars recovery of economic losses based on negligence

claims, so allowing the amendment to add a negligent-misrepresentation claim would be futile.

## ORDER

For these reasons, the court GRANTS in part and DENIES in part the Motion to Dismiss.

(ECF No. 29.)  It dismisses the abuse-of-process and fraudulent-misrepresentation claims; the

other claims are not dismissed.  The court GRANTS in part and DENIES in part the Motion for

Leave to File Third Amended Counterclaim.  (ECF No. 36.)  It denies the addition of the

negligent-misrepresentation claim; the other claims and supporting allegations may be amended.

NuCloud is given further leave to add more specific allegations to establish jurisdiction or

statements of the special damages it seeks to recover.  TLS must also file an amended complaint

alleging sufficient facts to establish the court's jurisdiction.  The amended pleadings must be

filed within three weeks of this order.

ISSUED this 18th day of April, 2016.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge